DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from the judgment of the Lucas County Court of Common Pleas which, following a jury trial, found appellant, Jesse Miller, guilty of murder, in violation of R.C. 2903.02(A), with an attendant firearm specification, in violation of R.C. 2941.145. Appellant was sentenced on September 15, 2000 to serve an indefinite term of fifteen years to life in prison for the murder conviction, with an additional mandatory term of three years in prison as to the firearm specification, to be run consecutively. Appellant's judgment entry of sentence was journalized on September 20, 2000.
 {¶ 2} On September 26, 2000, appellant filed a motion for new trial on the basis of juror misconduct. Attached to appellant's motion was an affidavit by appellant's trial counsel which stated that one of the jurors told him that, during the course of the trial, the juror conducted an experiment to test the testimony of one of the witnesses. Counsel attested that the juror told him that he placed a gun in his waistband, covered it with a tee-shirt, and asked his wife if she noticed anything different about him. Counsel's affidavit also indicated that the juror told counsel that he conducted experiments at home during the course of the trial regarding "the two shooting scenarios of Jessie Miller and Daniel Elizondo." This experiment allegedly concerned the juror's pointing and handling of his gun and his falling backwards in his dining room. Counsel's affidavit also indicated that neither the juror nor his wife would sign affidavits regarding the juror's conduct.
 {¶ 3} On October 6, 2000, the state responded to appellant's motion and asserted that counsel's affidavit was inadmissable hearsay. The state additionally asserted that in order to permit juror testimony to impeach a verdict, a foundation of extraneous, independent evidence must first be established from a source other than the jurors themselves. As such, the state argued that counsel's affidavit did not meet this requirement.
 {¶ 4} The trial court denied appellant's motion for new trial on October 17, 2000. Appellant timely appealed his conviction and denial of his motion for new trial and raises the following assignments of error:
 {¶ 5} "Assignment of Error Number One:
 {¶ 6} "The trial court erred to the prejudice of Mr. Miller by denying his motion for a new trial based on juror misconduct or, in the alternative, erred to the prejudice of Mr. Miller by failing to hold a hearing based on the allegation of juror misconduct, all in violation of his right to Due Process as guaranteed under the fifth, sixth, and fourteenth amendments to the United States Constitution and the applicable portions of the Ohio Constitution.
 {¶ 7} "Assignment of Error Number Two:
 {¶ 8} "The jury's verdict should be overturned as legally insufficient against the manifest weight of the evidence.
 {¶ 9} "Assignment of Error Number Three:
 {¶ 10} "The court erred in not instructing the jury on the lesser included offense of involuntary manslaughter, and trial counsel committed ineffective assistance of counsel in failing to request an instruction to the jury regarding the lesser included offense of involuntary manslaughter."
 {¶ 11} In his first assignment of error, appellant argues that the trial court erred in denying his motion for a new trial based on juror misconduct and in failing to hold a hearing on his motion. We disagree.
 {¶ 12} According to Crim.R. 33, a new trial may be granted for juror misconduct that materially affects an accused's substantial rights. See, also, State v. Keith (1996), 79 Ohio St.3d 514, 526. In determining the existence of juror misconduct, a trial court is prohibited from admitting juror testimony to impeach a jury verdict unless outside evidence of the alleged misconduct has been presented. State v.Hessler (2000), 90 Ohio St.3d 108, 123, citing, State v. Robb (2000),88 Ohio St.3d 59, 79. Additionally, the Ohio Supreme Court has also made it clear that "the information [alleging misconduct] must be from a source which possesses firsthand knowledge of the improper conduct."State v. Schiebel (1990), 55 Ohio St.3d 71, 75. This rule was explained at length by the Ohio Supreme Court in State v. Reiner (2000),89 Ohio St.3d 342, 349-350, reversed on other grounds by Ohio v. Reiner
(2001), 532 U.S. 17, which stated:
 {¶ 13} "It is a longstanding rule that `the verdict of a jury may not be impeached by the evidence of a member of the jury unless foundation for the introduction of such evidence is first laid by competent evidence aliunde, i.e., by evidence from some other source.'State v. Adams (1943), 141 Ohio St. 423, 427 * * *. Ohio has adopted this rule in Evid.R. 606(B), which states:
 {¶ 14} "`Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith. A juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any juror, only after some outside evidenceof that act or event has been presented. However a juror may testify without the presentation of any outside evidence concerning any threat, any bribe, any attempted threat or bribe, or any improprieties of any officer of the court. His affidavit or evidence of any statement by himconcerning a matter about which he would be precluded from testifyingwill not be received for these purposes.'
 {¶ 15} "The rule is intended to preserve the integrity of the jury process and the privacy of deliberations, to protect the finality of the verdict, and to insulate jurors from harassment by dissatisfied or defeated parties by prohibiting a court from questioning a juror about what occurred during deliberations, or about anything else that may have affected the juror's mind or emotions in the deliberations process once a final verdict is rendered. State v. Schiebel (1990), 55 Ohio St.3d 71,75; State v. Adams, 141 Ohio St. at 427. However, if there is a foundation of outside evidence of extraneous prejudicial information, or of any threat, bribe, or improper conduct by an officer of the court, the rule permits a court to ask a juror about that outside evidence." (Emphasis in original.)
 {¶ 16} In this case, the evidence presented to the trial court, in support of appellant's motion for new trial, was trial counsel's affidavit concerning statements allegedly made to him by one of the jurors after appellant's conviction and sentencing. The state argues that the affidavit is inadmissable hearsay and, in any event, inadmissible under Evid.R. 606(B). Appellant asserts that although the affidavit is hearsay, it is admissible as an exception to the hearsay rule under Evid.R. 804(A)(2), 804(B)(3) or 807.
 {¶ 17} We do not have to determine whether or not the affidavit qualifies as an exception to the hearsay rule because, in any event, the affidavit is inadmissible under Evid.R. 606(B). Pursuant to Evid.R. 606(B), the trial court could only inquire of the juror regarding his consideration of allegedly extraneous prejudicial information "after some outside evidence of that act or event has been presented." The only information presented in this case was hearsay statements allegedly made by the juror. Trial counsel had no firsthand knowledge of the improper conduct alleged in his affidavit. See Schiebel, supra. Accordingly, appellant has not demonstrated through evidence aliunde that the juror engaged in any misconduct.
 {¶ 18} Appellant argues that the aliunde rule is inapplicable in this case as the alleged misconduct did not apply to any matter that occurred during the course of deliberations. Contrary to appellant's argument, the Ohio Supreme Court has stated:
 {¶ 19} "* * * Although Evid.R. 606(B) protects the deliberations process, the language of the rule does not limit its application to the examination of improper conduct or communications only during deliberations. The rule also prohibits inquiry into `the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict * * * or concerning his mental processes in connection therewith.' This may involve inquiry into improper conduct that occurred throughout the trial, during the presentation of evidence, or among jurors during the course of the trial that may influence a juror's mind, emotions, or mental processes during deliberations. Events that occur during the trial may also have an effect upon the jurors' deliberations." Reiner, supra at 351.
 {¶ 20} Insofar as no firsthand information of juror misconduct was presented from any source other than a juror, the trial court properly disregarded the affidavit of trial counsel and correctly declined to conduct a hearing regarding the alleged juror misconduct. See Evid.R. 606(B), Hessler, 90 Ohio St.3d 108, Reiner 89 Ohio St.3d 342, Schiebel,55 Ohio St.3d 71, and Adams, 141 Ohio St. 423. Accordingly, we find appellant's first assignment of error not well-taken.
 {¶ 21} Appellant argues in his second assignment of error that the verdict was legally insufficient and against the manifest weight of the evidence. Sufficiency of the evidence and manifest weight of the evidence are quantitatively and qualitatively different legal concepts.State v. Thompkins (1997), 78 Ohio St.3d 380, 386. "Sufficiency" applies to a question of law as to whether the evidence is legally adequate to support a verdict as to all elements of a crime. Id. In making this determination, an appellate court must determine whether, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 22} Whereas, under a manifest weight standard, an appellate court sits as a "thirteenth juror" and may disagree with the fact finder's resolution of the conflicting testimony. Thompkins at 387. The appellate court,
 {¶ 23} "`reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " Id., quoting State v. Martin (1983), 20 Ohio App.3d 172,175.
 {¶ 24} Appellant was convicted of violating R.C. 2903.02(A), which states that "[n]o person shall purposely cause the death of another * * *." Pursuant to R.C. 2941.145, a three-year mandatory prison term can be imposed when "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense."
 {¶ 25} Appellant argues that the verdict is insufficient and against the manifest weight of the evidence because "[o]nly one witness, Daniel Elizondo, unequivocally identifie[d] the defendant as the individual who shot the victim." Appellant challenges Elizondo's credibility because he only identified appellant after Elizondo had been detained by the police as a suspect.
 {¶ 26} Upon review of the record, we find that the jury did not clearly lose its way in convicting appellant of murder, with a firearm specification. Primarily, we note that the evidence was sufficient to convict appellant of murder because Elizondo testified that appellant shot the victim in this case. As such, the conviction is legally sufficient and the only inquiry remaining concerns whether the verdict is against the manifest weight of the evidence.
 {¶ 27} Elizondo testified that John McCardell, the victim in this case, took a magazine and a small amount of marijuana from Wes Miller, appellant's brother. On June 19, 2000, appellant and Wes came to Elizondo's home and confronted Elizondo regarding the magazine. Elizondo indicated that he could probably get the magazine back from McCardell. Appellant drove Wes and Elizondo, in appellant's car, to McCardell's home. Appellant parked in the alley behind McCardell's home, Elizondo went in and returned a few minutes later with McCardell, who told appellant that he had burned the magazine and was not going to pay for it.
 {¶ 28} At that point, according to Elizondo, appellant pulled a gun out of his waistband and started waving it around, demanding that McCardell do something about the magazine, that he pay something. McCardell refused to pay for it and, at that point, Elizondo intervened and told appellant to put the gun away. After appellant and McCardell "[stood] there and stare[d] each other down for a second," appellant put his gun in his back pocket and began to get in his car. Elizondo testified that he told appellant and Wes to leave. Elizondo was going to stay with McCardell. As appellant was getting into his car, Elizondo testified that appellant told McCardell, "I shouldn't have had to pull no gun out, you should have gave me the magazine back, wouldn't have had to get in a pistol —." McCardell responded, "It's too late, you already brought pistols into it." At that point, appellant, who was about half way into his car, pulled the gun out again and started shooting at McCardell. When McCardell fell back on the ground, appellant approached him and shot into McCardell a few more times.
 {¶ 29} Elizondo testified that, after the shooting, appellant ordered Elizondo back into the car. Elizondo asked to be let off at his sister's house, which was closer than going back to his own house. Elizondo eventually called the police that evening and met with them the next day, where he told them the same version of events that he testified to at trial.
 {¶ 30} In addition to Elizondo's testimony, Carrie Tracy, Elizondo's upstairs neighbor, testified that on June 19, 2000, from her window, she saw appellant retrieve something from the trunk of his car and appear to place it into his waistband. Thereafter, Tracy saw Elizondo approach appellant, talk with him, and then get into appellant's car and leave. Tracy, however, did not actually see an object, rather, she could only testify that based on his movements, it appeared as though appellant had retrieved something from the trunk and placed it in his waistband. Tracy also testified that she saw McCardell with Elizondo on a regular basis, but had only seen Elizondo with appellant and/or Wes two or three times. Her testimony is seemingly consistent with Elizondo's testimony that he was very good friends with McCardell and saw him almost daily.
 {¶ 31} McCardell's neighbor testified that he heard the gunshots. The pattern of the gunshots, as testified to by Elizondo, was consistent with the pattern of shots as testified to by McCardell's neighbor.
 {¶ 32} Although appellant and Wes both initially gave a different version of the facts to the police, i.e., they were not present at the scene, they both eventually testified that Elizondo shot McCardell. According to appellant, he was good friends with Elizondo. When Elizondo came outside with McCardell, appellant and McCardell started to argue about the magazine and then began to "tussle." McCardell was on top of appellant and hit him twice in the stomach, once in the neck, and once on the head. At this point, Elizondo kicked McCardell twice, like a "football punt * * * pretty hard," in McCardell's upper body. As McCardell was falling backwards, Elizondo shot McCardell. While McCardell was lying on his back, Elizondo stood over him and shot him several more times. According to appellant, Elizondo instructed appellant to get back in the car and the three of them left the scene. Appellant was stopped by the police later the next day, arrested, and interrogated.
 {¶ 33} The angle of the gunshot wounds, as testified to by the deputy coroner, seemingly could have occurred with either Elizondo's or appellant's version of the events. However, other evidence does not support appellant's version of events. For example, although McCardell and appellant were supposed to have been fighting on concrete, appellant showed no signs of any injury on his body. Moreover, McCardell showed no signs of injury, besides the gunshot wounds, or bruising to his body or knuckles, which may have been present if he had been involved in an altercation and was kicked hard in the upper body.
 {¶ 34} With respect to appellant's challenge of Elizondo's credibility, we note that the jury is free to believe or disbelieve any or all of any witness's testimony. In this case, Elizondo contacted the police and never changed his version of events; whereas appellant and Wes both lied to the police and gave different versions of events to the police.
 {¶ 35} Based on the foregoing, we find that the jury did not lose its way and that there was ample evidence upon which the jury could have relied in finding appellant guilty, beyond a reasonable doubt, of the murder of John McCardell, with a firearm. Appellant's second assignment of error is therefore found not well-taken.
 {¶ 36} In his third assignment of error, appellant argues that trial counsel was ineffective in failing to request an instruction to the jury regarding the lesser included offense of involuntary manslaughter. Specifically, appellant asserts that the evidence presented by the state demonstrates that appellant only shot the victim after the victim engaged in verbal provocation. Appellant argues that such provocation would support a verdict of voluntary manslaughter and, as such, the court should have instructed the jury as to the charge of voluntary manslaughter.
 {¶ 37} Appellant's counsel did not request such an instruction and the sole defense presented was that appellant was not the shooter. According to State v. Griffie (1996), 74 Ohio St.3d 332, "* * * Failure to request instructions on lesser-included offenses is a matter of trial strategy and does not establish ineffective assistance of counsel. Statev. Clayton (1980), 62 Ohio St.2d 45, * * * certiorari denied (1980),449 U.S. 879, 101 S.Ct. 227, 66 L.Ed.2d 102."
 {¶ 38} Appellant also alleges that appellant's trial counsel revealed to a bar disciplinary panel, in September 2000, that "he was suffering from a number of personal, professional, and physical problems." Appellant argues that "[i]t is entirely possible that trial counsel's performance in this matter was colored by the problems noted by the Ohio Supreme Court" and that "[t]here is nothing wrong with advancing alternative defenses in a criminal case." Even overlooking the fact that appellant's counsel wants us to consider evidence de hors the record, we note that there is absolutely no basis for appellant's argument. Although "there is nothing wrong with advancing alternative defenses in a criminal case," there is also nothing wrong with advancing an all-or-nothing defense, especially when the defendant testified he was not the person who did the shooting.
 {¶ 39} Accordingly, we find that appellant failed to establish that trial counsel's performance was deficient. See Strickland v.Washington (1984), 466 U.S. 668. Appellant's third assignment of error is therefore found not well-taken.
 {¶ 40} On consideration whereof, this court finds that appellant was not prejudiced or prevented from having a fair trial and the judgment of the Lucas County Court of Common Pleas is affirmed. Court costs of this appeal are assessed to appellant.
JUDGMENT AFFIRMED.
Peter M. Handwork, J., James R. Sherck, J., and Richard W. Knepper,J., CONCUR.